## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ADRIAN IRVING,<br><br>                    Plaintiff,<br><br>          v.<br><br>TWANA FURTIK; JANE M. VENTRELLA, RN; DEBBIE M. LEMBRICK, RN; STACY-ANN MONTAGUE, RN; EILEEN PEREDA, RN; TANYA BROWN, RN; VICTORYA STORK, APRN; ROBERT BONNETIS, LPN; SENGCHARH VILAYVONG, RN; JOY C. BURNS, RN; NICOLE RING, RN; CATHRYN BOILARD, RN; LT. MASSEY, LT. RULE; BELINDA BURGESS;<br><br>                    Defendants. | Civil Action No.<br>3:20-CV-1110 (CSH)<br><br><br><br><br><br>**AUGUST 1, 2022** |

## INITIAL REVIEW ORDER

**HAIGHT, Senior District Judge:**

*Pro se* plaintiff, Adrian Irving, an inmate currently housed at Hartford Correctional Center, in Hartford, Connecticut, commenced this action pursuant to 42 U.S.C. § 1983 against seventeen Defendants, state prison officials or employees, each of whom were employed at Cheshire Correctional Institution ("Cheshire") or MacDougall-Walker Correctional Institution ("MacDougall-Walker), two prisons where Plaintiff was previously incarcerated. The Defendants include: Twana Furtik, Jane M. Ventrella, Debbie M. Lembrick, Stacy-Ann Montaque, Eileen Pereda, Tanya Brown, Victorya Stork, Bonnie Boguslawa Pelzcar, Robert Bonnetis, Sengcharh Vilayvong, Joy C. Burns, Nicole Ring, Cathryn Boilard, Lieutenant Massey, Lieutenant Rule, Belinda Burgess, and Counselor

1

Supervisor Santana.[1]  All Defendants were nurses or medical staff at one of the two prisons, except correctional officers Massey and Rule and prison counselor Santana.  Irving alleges that the Defendants were deliberately indifferent to his serious medical needs and/or subjected him to unsafe conditions of confinement in retaliation for his complaints about lack of medical care.  Irving seeks both monetary damages and injunctive relief from the Defendants in their individual and official capacities.

## I.  STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, it is incumbent on the Court to screen civil actions filed by prisoners seeking redress from a governmental entity, officer or employee.  Specifically, the Court must review such a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2).

Although highly detailed allegations are not required, the Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678

---

[1]  In his Complaint, Plaintiff has included factual allegations regarding MacDougall-Walker employees named  "Bonnie Boguslawa Pelczar," a medical staff employee, Doc. 1-1, ¶¶ 9, 27, 28, and "Counselor  Supervisor Santana,"  *id.* ¶¶ 17, 35-37.  Although these individuals are not listed in the case caption, as prescribed by Rule 10(a), Fed. R. Civ. P., Plaintiff describes them repeatedly as "Defendant[s]" throughout  the Complaint.  Treating Plaintiff with ample leniency as a *pro se* litigant, because it is clear that he intended to include these two individuals as Defendants but inadvertently omitted their names from his handwritten case caption, the Court will order the Clerk to amend the caption to reflect their status as Defendants in the action.

(citing *Twombly*, 550 U.S. at 556).   Although this plausibility standard is not a "probability requirement," it imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."  556 U.S. at 678.

In undertaking this analysis, the Court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (citations and internal quotation marks omitted).   However, the Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008)).   Moreover, "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).   Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  556 U.S. at 678  (citing *Twombly*, 550 U.S. at 555).   Ultimately, "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." 556 U.S.  at 663-64 (citing *Twombly,* 550 U.S. at 556).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 3006) *(per curiam*)).   *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S.

3

97, 106 (1976)).

This liberal approach does not, however, exempt *pro se* litigants from the minimum pleading requirements described above: a *pro se* complaint still must "'state a claim to relief that is plausible on its fact.'" *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). The court may not "invent factual allegations that [the plaintiff] has not pled." *Id.*

## II.  BACKGROUND

Interpreting the Plaintiff's Complaint to raise the strongest arguments it suggests, the Court examines Plaintiff's specific factual allegations to determine whether they state any claims upon which relief may be granted.

On December 13, 2019, Irving was sent to Cheshire Correctional Institution to begin serving his prison sentence. Doc. 1-1 ("Complaint"), ¶ 18.[2] He remained at Cheshire for three months. *Id.* During that time, Irving began experiencing severe headaches, dizziness, and blurred vision due to a "large growth/edema" near his right temple. *Id.* He contacted the medical unit, but his "pleas for medical treatment" were denied by Defendants Ventrella, Lembrick, Montaque, and Pereda, who were nurses in that unit. *Id.* Irving explained to these nurses that the edema often throbbed at night when he tried to sleep or lay down. *Id.* Nonetheless, the Cheshire medical staff ignored Plaintiff's

---

[2]  Because Plaintiff filed a "replacement pdf" of his Complaint, the Court construes Doc. 1-1 as the operative complaint in this action. Absent explanation for this replacement and without any indication that textual amendments were made, the Court refers to this pleading as the "Complaint" (as opposed to the "Amended Complaint") herein.

4

complaints. *Id.* Moreover, Defendants Ventrella and Lembrick told Irving to "give [the problem] time" because "it may go away." *Id.*

By January 2020, the edema "had grown to the size of a softball" and Irving's vision in his right eye became increasingly blurred. *Id.* ¶ 19. He submitted written requests to see a doctor and grievances. *Id.* The nurse Defendants at Cheshire would periodically call him to the medical unit, but then label him "an annoyance," and threaten to transfer him if he continued to send requests to the medical unit. *Id.* Defendants Ventrella, Lembrick, and Pereda told Irving that the edema did "not [seem] important to them as it was not life-threatening." *Id.* These Defendants also advised Plaintiff once again to give his problem time to resolve. *Id.* When Irving complained about severe pain and loss of vision, these Defendants failed to examine him and instead advised him to return to his cell and remain on bed rest for one week. *Id.* ¶¶ 20-21.

Irving continued to complain and file grievances, which allegedly resulted in his transfer to MacDougall-Walker Correctional Institution on February 5, 2020. *Id.* ¶ 22. Upon arriving at MacDougall-Walker, Irving began submitting requests to see a doctor for treatment of his edema. *Id.* ¶ 23. On February 12, 2020, Defendant nurse Tanya Brown called Irving to the medical unit to examine him. *Id.* ¶ 24. However, although she took his vital signs, Brown failed to examine the edema. *Id.* Two days later, Brown again called Plaintiff to the medical unit. *Id.* ¶ 25. This time she checked Irving's vital signs but also told him that she would inform the doctor about the edema so "be patient." *Id.* Brown noted that, at that point, the edema was the "size of a baseball" and appeared to be "growing bigger." *Id.* ¶ 26. Plaintiff recalls that, consequently, he "could barely see from his right eye" and "was in severe pain." *Id.*

From February through May of 2020, Defendants Stork, Furtik, Boguslawa, Bonettis,

Vilayvong, Burgress, Burns, Ring, and Boilard denied Irving treatment in the MacDougall-Walker medical unit.[3] *Id.* ¶ 27.  Defendants Stork, Furtik, Boguslawa,  Bonettis, Vilayvong, Burns, Ring, and Boilard told Irving that, because his sentence was "not . . .more than five (5) years," he would not receive surgery for the edema. *Id.* ¶¶ 28, 34.  Defendants Stork, Bonettis, Burns, and Boilard provided Plaintiff with Tylenol for his pain, allegedly because "surgery would cost more." *Id.* ¶ 28. When Irving expressed concerns to Defendant Stork that he might suffer permanent vision loss, she just told him that "we'll wait to see if [the problem] get[s] any worse." *Id.*

According to Plaintiff,  in response to his many complaints regarding lack of medical treatment, Defendant Santana, a prison counselor at MacDougall-Walker,  moved him into a cell with an inmate named Harvey on June 12, 2020.[4] *Id.* ¶ 36.  Irving asserts that correctional staff were aware that  Harvey was  "problematic" because he "starts fights and assaults his cellmates." *Id.*  On June 13, 2020, inmate Harvey struck Irving on the head with his cane. *Id.* ¶ 37. Due to the resulting injury, Irving needed ten stitches. *Id.*  Irving alleges that MacDougall-Walker staff, including counselor Santana and three non-defendants ("Sardina, Demers, and Claudio"),  knew of Harvey's propensity to violence. *Id.* ¶ 37.  Irving also alleges that Defendants Massey and Rule, correctional officers at MacDougall-Walker, condoned Plaintiff's transfer to inmate Harvey's cell. *Id.* ¶ 35.

### III. DISCUSSION

Upon review of the factual allegations contained in the Complaint, it is apparent that Irving has attempted to state three causes of action: deliberate indifference to serious medical needs,

---

[3]  The Court refers to Defendant Bonnie Boguslawa Pelczar as "Boguslawa" in short (rather than "Pelczar") because that comports with Plaintiff's practice in the Complaint.

[4] *See*  n.1, *supra*.

deliberate indifference to safety or failure to protect, and retaliation. First, Plaintiff has alleged that Defendants Furtik, Ventrella, Stork, Lembrick, Montaque, Brown, Burns, Ring, Bonettis, Pereda, Vilayvong, Burgress, Boilard, and Boguslawa were each deliberately indifferent to his serious medical needs by failing to provide treatment for his edema and/or to alleviate his severe pain for over six months. Second, Plaintiff has alleged that Defendants Santana, Massey, and Rule were each deliberately indifferent to his safety or failed to protect him from harm with respect to Plaintiff's transfer to inmate Harvey's cell in June 2020, which thereby subjected Plaintiff to assault by Harvey. Third, Plaintiff has alleged that his transfer to MacDougall-Walker, and thereafter to inmate Harvey's cell, constituted retaliation for his complaints regarding lack of medical treatment.

## A.  Deliberate Indifference to Serious Medical Needs

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to a serious medical need, a plaintiff must demonstrate both that his need was serious, and that the defendant acted with a sufficiently culpable state of mind. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Accordingly, there are both objective and subjective prongs embodied in the deliberate indifference standard.

Objectively, the alleged deprivation must be "sufficiently serious," such that the condition is one "of urgency, . . . that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted). "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

7

Furthermore, a medical condition which is not initially serious may become so because it is degenerative.  In other words, if left untreated or neglected for a long period of time, the condition may "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  Therefore,  "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison*, 219 F.3d at 136–37.

The Second Circuit has identified several factors that are "highly relevant to the inquiry into whether a given medical condition is a serious one."  *Chance*, 143 F.3d at 703.  In determining whether a medical condition is sufficiently serious, courts examine whether there is  "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment;" if the condition "significantly affects an individual's daily activities;" or whether there exists "chronic and substantial pain."  *Id.* at 702 (citation and internal quotation marks omitted).

In addition, in circumstances where "a prisoner receives some care, but allegedly inadequate care, the analysis of whether there was a sufficiently serious medical condition is more complex." *Hardy v. City of New York*, 732 F. Supp. 2d 112, 128 (E.D.N.Y. 2010).  In such cases, "the court must focus on whether 'the *alleged deprivation* of adequate medical care [was] sufficiently serious.' " *Id.* (emphasis in original) (quoting *Salahuddin*, 467 F.3d at 279).  The court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280 (citation omitted).  In evaluating whether a delay in treatment is sufficiently serious, "the actual medical consequences that flow from the alleged denial of care will be highly relevant."  *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003); *see also Snyder v. Alam*, No. 15-cv-4033, 2016 WL 2642226, at *4 (S.D.N.Y. May 6, 2016)

(stating that "only those injuries plaintiff specifically attributes to the delay will be considered").

With respect to the subjective prong, the "charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citing *Salahuddin*, 467 F.3d at 280). They must have been "*actually aware* of a substantial risk that serious inmate harm will result" due to their actions or inactions. 719 F.3d at 138 (emphasis in original). They must know of the risk to the inmate's health and safety – be "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . .draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). However, the officials need "not intend harm[;] [a]nd awareness may be proven 'from the very fact that the risk was obvious.'" *Spavone*, 719 F.3d at 138 (quoting *Farmer*, 511 U.S. at 842).

Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983. *Salahuddin*, 467 F.3d at 280-81. The official's actions must be "more than merely negligent." *Id*. at 280. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . .be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Such failure does not constitute deliberate indifference.

Nor does a disagreement over the treatment provided show deliberate indifference. *Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance*, 143 F.3d at 703). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id. See also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have

the right to choose his medical treatment as long as he receives adequate treatment …. [T]he essential test is one of medical necessity and not one simply of desirability.") (citations and internal quotation marks omitted)).

As to the objective component of a "serious medical need," Irving alleges that during his three months of incarceration at Cheshire, he had an edema on the right side of his head that "cause[d] [him] extreme pain in the back of [his] eyes and head." Doc. 1-1, ¶ 18.  Moreover,  the edema grew "to the size of softball" and caused the "vision in [his] right eye" to become "blurred." *Id.* ¶ 19. On a daily basis, in addition to impairing vision, the edema's painful nature prevented him from laying down and/or sleeping. *Id.* ¶ 18.   Subsequently, while incarcerated at MacDougall-Walker, Plaintiff remained "in severe pain" due to the edema on his right temple. *Id.* ¶ 24.  The edema allegedly maintained "the size of an [sic] baseball" and continued to "grow[ ] bigger," causing Plaintiff to "barely" be able to "see out [of his] right eye." *Id.* ¶ 26.  The Court finds that due to the perpetually increasing  size of the edema  –  resulting in  chronic, extreme pain, inability to sleep, and degeneration of Plaintiff's eyesight – Plaintiff has sufficiently pled that he suffered from a "serious medical condition," thereby satisfying the objective prong of the deliberate indifference analysis.[5]  *See, e.g., Heard v. Chapman*, 759 F. App'x 495, 497 (7th Cir. 2019) (ameloblastoma, a benign but aggressive tumor that can erode the jawbone if not treated, was properly considered "an objectively serious medical condition" by the district court); *Rodriguez v. Miller,* No. CV01836KBMLCSACE, 2002 WL 35649848, at *7 (D.N.M. July 15, 2002) ("[S]erious symptoms

---

[5]  This is not to say that if Plaintiff's edema turns out to have been plainly benign, such as a "fatty" tumor, his claim may not later fail on the evidence.  He will be left to prove his claim, including the facts he has alleged.  However, at the pleading stage, due to Plaintiff's allegations of a baseball-sized protrusion, severe and throbbing pain, and blurred vision, the Court will accept, for purposes of initial review, that he has pled a "serious medical problem."

caused by the [spinal] tumor – increasing back pain, numbness, incontinence and other symptoms Plaintiff related at the time he sought treatment –" sufficed to show that the objective "prong [was] met.")

As to subjective failure to treat Plaintiff's condition, Plaintiff has pled that he expressed his concerns about his burgeoning edema to the medical staffs at both Cheshire and MacDougall-Walker. At Cheshire, Defendants Ventrella, Lembrick, Montaque, and Pereda, all of whom were nurses, denied him any medical treatment. Doc. 1-1 ("Complaint"), ¶ 18. Furthermore, Ventrella, Lembrick, and Pereda commented that the edema might go away and ordered him to stay on bed rest for a week. *Id.* ¶¶ 18-20. Subsequently, upon arriving at MacDougall-Walker, Defendant Brown, a nurse, took Plaintiff's vital signs but provided no treatment for his edema. *Id.* ¶¶ 24-25. Although Brown told Plaintiff that she would inform a doctor about his condition, no medical treatment followed. *Id.* ¶ 25. For the remainder of his time at MacDougall-Walker, medical staff, including Defendants Stork, Furtik, Boguslawa, Bonettis, Vilayvong, Burgress, Burns, Ring, and Boilard, all denied Plaintiff treatment. *Id.* ¶ 27. Furthermore, Defendants Stork, Furtik, Boguslawa, Bonettis, Vilayvong, Burns, Ring, and Boilard told Irving that he would not be allowed to receive surgery because his sentence was too short (not more than five years); and Defendants Stork, Bonettis, Burns, and Boilard then prescribed Tylenol. *Id.* ¶ 28. "[E]ach time [he] complained about extreme severe pain, migraines, [and] blurred vision, these defendants advise[d] him . . . to go back to [his] cell and lay down." *Id.* ¶ 29.

From these allegations, it appears that members of the medical staffs at both Cheshire and MacDougall-Walker were aware of Plaintiff's huge edema, chronic pain, and debilitating vision loss, which would continue if they failed to act. Certainly, at MacDougall-Walker, Defendants'

alleged refusal to consider surgery for the baseball-sized edema due to Plaintiff's less than five-year sentence suggests a subjective disregard for his medical condition. *Id.* ¶ 28. Moreover, Plaintiff alleges that he did not receive an examination or medical treatment by staff at either prison; he was simply given Tylenol and/or told to go lay down. *Id.* ¶¶ 18-21, 24-25, 27-28, 34. From the facts presented, one can infer that the edema posed a "substantial risk of serious harm." *Farmer*, 511 U.S. at 837. Moreover, given Defendants' information about Plaintiff's chronic pain and blurred vision, it appears that they must have drawn the inference that the edema would have to be treated to alleviate significant risks of harm. *Id.* Nonetheless, no medical treatment was provided. Because the Court must credit Irving's allegations on initial review, Plaintiff's claim of "deliberate indifference to serious medical needs" will proceed with respect to the alleged edema.

**B.   Deliberate Indifference to Safety/Failure to Protect**

Irving contends that Defendant Santana, his "counselor supervisor" at MacDougall-Walker, intentionally placed him "in a hazardous living condition" by transferring him into the cell of inmate Harvey, who was known to be violent. Doc. 1-1, ¶ 35. Santana allegedly made this transfer in retaliation for Plaintiff's constant complaints to medical staff regarding lack of treatment for his edema. *Id.* ¶ 36. In addition, Plaintiff claims that Defendants Massey and Rule "condoned" Santana's decision to transfer him into Harvey's cell, thereby subjecting him to unconstitutional conditions of confinement.[6] *Id.* ¶ 35. Rather than a claim for unconstitutional conditions of confinement, the Court, however, construes this claim to more properly allege deliberate indifference to safety or failure to protect from harm.

---

[6]  With regard to this claim, Plaintiff mentions the names and alleged actions of various prison officials and employees who are not parties to this action. Doc. 1-1, ¶¶ 36-37. The Court refrains from analysis of claims with respect to these non-defendants.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of ... inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). Prison officials have a duty to make reasonable efforts to ensure inmate safety, which includes protecting inmates from "violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). *See also Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  To establish a constitutional violation, Irving must show that the conditions of his incarceration posed a substantial risk of serious harm and that prison officials were deliberately indifferent to his safety.  *Farmer*, 511 U.S. at 834.

First, the prisoner must prove that the deprivation was "objectively, sufficiently serious." *Id.* (citation and internal quotation marks omitted) . If the claim is based on the official's failure to prevent harm, the plaintiff must prove that he is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*  To determine whether the prisoner faced an excessive risk of serious harm, courts "look at the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. County of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (citation and internal quotation marks omitted).

Second,  the prisoner must prove that the prison official acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Sieter*, 501 U.S. 294, 297 (1991)). This requirement is based on the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." 511 U.S. at 834  (quoting *Wilson*, 501 U.S. at 297). The prison official must have known of and disregarded an excessive risk to the prisoner's health or safety. 511 U.S. at 836-37. Whether an official had knowledge of a substantial risk of harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. Therefore, "a factfinder may conclude that a prison official knew of a substantial risk from

the very fact that the risk was obvious." *Id.* The question under the Eighth Amendment is "whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health." *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

In the case at bar, Plaintiff alleges that prison officials and correctional officers at MacDougall-Walker were aware that "inmate Harvey" was "problematic" in that he was prone to "start[ ] fights and assault[ ] his cellmates." Doc. 1-1, ¶ 36.  In so alleging, Plaintiff suggests that inmate Harvey had a record of making such assaults. If true, confinement with Harvey may have posed an objective substantial risk of serious harm to Plaintiff.  The fact that Harvey then hit Irving on the head with his cane, creating a wound meriting ten stitches, supports that inference. *Id.* ¶¶ 36, 38, 45.

Next, as to a culpable state of mind, when Defendant Santana transferred Plaintiff into Harvey's cell, he allegedly knew that Harvey was a dangerous inmate and issued the transfer to punish and deter Plaintiff's persistent complaints regarding lack of medical treatment for his edema. Doc. 1-1, ¶ 36, 45.  According to Plaintiff, Santana specifically ordered Plaintiff to "stop complaining and bugging the medical department." *Id.* ¶ 36.  Then when Plaintiff continued to complain about needing medical care, Santana threatened, "O.k. tuff [sic] guy, since you do not wanna [sic] listen, I'm moving you to inmate Harvey['s] cell." *Id.*  Under those circumstances, one could infer that Santana  knew that Harvey was prone to violent behavior, creating a substantial risk of serious harm; and Santana then purposely transferred Irving to punish him for his complaints.  At the pleading stage, Plaintiff has adequately pled that Santana made the dangerous transfer with a sufficiently culpable state of mind.

14

In contrast, as alleged, Defendants Massey and Rule simply "condoned" Irving's transfer to inmate Harvey's cell. *Id.* ¶ 35. Due to their positions as correctional officers, Plaintiff attributes them with the "knowledge that [he] would be assaulted," *id.* ¶ 38; but there is no indication that they were responsible for the transfer. Moreover, there are no facts to show they had any input or decision-making power in that regard. Rather, as Plaintiff alleges, his prison counselor Santana made the transfer due to Irving's persistence in making medical complaints. *Id.* ¶ 36. Where there is no proof that Defendants Massey and Rule engaged in making the transfer decision, much less that they did so with "sufficiently culpable" states of mind, the "failure to protect" claim against them will be dismissed.

## C. Retaliation

The third claim Plaintiff attempts to state is one for retaliation. The Second Circuit has indicated that "to sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation and internal quotation marks omitted).

In the case at bar, Irving alleges that he was transferred to MacDougall-Walker due to his complaints and grievances regarding lack of medical treatment at Cheshire. Doc. 1-1, ¶ 22. Specifically, he states that he complained to Defendants Ventrella, Lembrick, Montaque, and Pereda, nurses whom he alleges failed to treat the huge edema on his right temple. *Id.* He also alleges that these nurses "repeatedly call[ed] [him] down to their medical unit to threaten [him] with a transfer if [he] continue[d] to send requests to the medical unit." *Id.* ¶ 19. He "continued to complain and

filed a grievance against these defendants." *Id.* ¶ 22.  Thereafter, he was transferred from Cheshire to MacDougall-Walker.

Plaintiff also alleges that while incarcerated at MacDougall-Walker, he once again suffered retaliation when prison officials moved him to the cell of an allegedly dangerous inmate named Harvey. *Id.* ¶ 35.  According to Plaintiff, he was threatened by Defendant Santana" that he "better stop complaining and bugging the medical department" for treatment of his edema.  *Id.* ¶¶ 35-36.  When Plaintiff continued to complain, Santana allegedly stated, "O.k. tuff [sic] guy, since you do not wanna [sic] listen, I'm moving you to inmate Harvey['s] cell." *Id.* ¶ 36.

As to the first factor of Irving's retaliation claim, protected speech or conduct, "[t]here is no serious question that, for pleading purposes, [a prisoner] alleges protected activity" when he asserts he filed "a complaint . . . or internal grievances." *Smith v. Maypes-Rhynders*, No. 07 CIV.11241 (PAC) (MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009) (citing *Pidlypchak*, 389 F.3d at 381, 383–84 (treating the filing of prison grievances as protected First Amendment activity)).  *See also  Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996) (filing a prison grievance is protected activity; the "right to petition government for the redress of grievances" is constitutionally guaranteed).  Here,  Irving alleges that he made repeated oral and written requests for medical treatment and filed grievances about the lack of treatment. Doc. 1-1, ¶¶ 18-20, 22, 29.  Such alleged complaints and/or grievances may be characterized as "protected" speech.

As to "adverse action," the second factor in proving retaliation, Irving alleges two actions: transfer from Cheshire to MacDougall-Walker and placement in inmate Harvey's cell.  With respect to his transfer from  Cheshire to MacDougall-Walker, such a prison transfer does not comprise "adverse action" in the absence of any evidence as to how the transfer was disadvantageous to Irving.

16

"Although 'prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights,' *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), [a prisoner] need[s]to allege that the transfer specifically constituted adverse action, not that his presence at [the other location]  in general adversely affected him." *Green v. Martin*, 224 F. Supp. 3d 154, 175 (D. Conn. 2016).  In his Complaint, Irving provides no details to distinguish between conditions at Cheshire and MacDougall-Walker.  He thus fails to explain why his presence at MacDougall-Walker created an adverse situation for him.

In contrast, with regard to placement in a cell with an inmate with a known propensity toward violence, such a transfer may be viewed as an "adverse action."  Moreover, if that transfer was made in response to Plaintiff's repeated complaints regarding lack of medical treatment, there are grounds to find the requisite third factor, a "causal connection" between Plaintiff's protected speech and the adverse action.

In the case at bar , Plaintiff states that his "counselor supervisor Santana" threatened to move him to inmate Harvey's cell because Plaintiff would not stop "complaining and bugging the medical department." Doc. 1-1, ¶ 36.  Given these allegations, there is a causal connection between Plaintiff's protected speech of complaints and grievances and Santana's adverse action of transferring Plaintiff into the cell of a dangerous inmate.  Consequently, the retaliation claim against Defendant Santana may proceed.

 However, as to correctional officers Massey and Rule, although they allegedly "condoned" the transfer, there are no facts to demonstrate that they participated in the decision to make that transfer, or even had the authority to do so.  In the absence of a causal connection between these  two Defendants and the adverse action of the transfer, Plaintiff's retaliation action against Massey and

Rule fails to state a claim upon which relief may be granted.  Both the protected activity – complaints and grievances – and proof that such activity *caused* them to take adverse action are necessary for Plaintiff to make out a retaliation claim.[7]  Lacking sufficient factual allegations to state a claim for relief, Plaintiff's retaliation claim against Massey and Rule will be dismissed.

## D.     Official Capacity Claims

Irving states that he seeks damages from Defendants, state employees and officials, in their "official and individual capacities." Doc. 1-1, at 1.  The Eleventh Amendment prohibits an award of money damages against state officials in their official capacities unless the state has waived this immunity or Congress has abrogated it.  *Kentucky v. Graham*, 473 U.S. 159, 169 (1995); *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  Section 1983 does not abrogate state sovereign immunity, *Quern,* 440 U.S. at 343; and Irving alleges no facts suggesting that the state of Connecticut has waived immunity in this case.  Thus, Irving cannot recover money damages from Defendants in their official capacities.  Accordingly, pursuant to 28 U.S.C. § 1915A(b)(2), any claim for damages against Defendants in their official capacities will be dismissed for lack of jurisdiction.

In addition, Irving seeks injunctive relief in the form of medical treatment at an "outside hospital." Doc. 1-1, ¶ 46.  In the Second Circuit, an inmate's transfer from a correctional facility generally moots claims for declaratory and injunctive relief against officials at that facility.

---

[7]    Similarly, there is no "causal connection" between Plaintiff's complaints and the Defendant nurses' denial of medical treatment for his edema.  Denial of medical treatment for a period of time in response to protected activity may be considered adverse action.  *Olutosin v. Lee*, No. 14-cv-685(NSR), 2016 WL 2899275, at *10 & n.5 (S.D.N.Y. May 16, 2016).  However, Irving alleges that he was denied medical treatment both *before* and *after* making complaints that he lacked such treatment.  Moreover, he alleges no facts to show that his complaints were the cause of the continuing lack of treatment.  Under those circumstances, the Court cannot infer that his complaints caused adverse action by these nurses.

*Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (collecting cases).  The incidents underlying this action occurred at Cheshire and MacDougall-Walker and all defendants work at those facilities. When he filed this action, Irving listed his address as Osborn Correctional Institution ("Osborn"). Moreover, he is currently housed at Hartford Correctional Center.  Given that he is neither incarcerated at Cheshire nor at MacDougall-Walker, his claims for injunctive relief against the Defendants are dismissed as moot.  *See, e.g., Salahuddin,* 467 F.3d. at 272. (The prisoner is "presently incarcerated in Oneida Correctional Facility, which is not one of the prison facilities in which the actions complained of here occurred, and therefore we hold moot all injunctive and declaratory claims" against defendant employees of those prisons).

Furthermore, the Court cannot award injunctive relief against the medical staff at either Osborn or Hartford Correctional Center, who are not parties to this action.  *See, e.g., In re Rationis Entm't Inc. of Pan.*, 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction."); *Lapierre v. Lavalley*, No. 9:15CV1499(MAD/DJS), 2016 WL 4442799, at *3 (N.D.N.Y. Aug. 23, 2016) (plaintiff could not seek injunctive relief over correctional staff at prison to which he had been transferred as they were not defendants in the case;  and plaintiff could not seek injunctive relief against staff at former facility because transfer mooted request for injunctive relief); *Oliphant v. Villano*, No. 3:09-cv-862 (JBA), 2010 WL 5069879, at *2 (D. Conn. Dec. 3, 2010) ("[T]he Court lacks jurisdiction to enjoin the conduct of prison mental health, medical and correctional staff who are not defendants in this action.").  All claims in this action for injunctive relief will thus be dismissed.

19

## IV.  CONCLUSIONS AND ORDERS

To correct drafting errors of inadvertence by *pro se* Plaintiff Irving**, the Clerk** is instructed to **correct the case caption** by **adding the names of Defendants** "Bonnie Boguslawa Pelczar" and "Counselor Supervisor Santana."  The Clerk shall also **add these two names to the case docket**. These individuals were named as Defendants and included in the allegations throughout the Complaint, but failed to appear in the handwritten caption.

Pursuant to the Court's initial review, the case will proceed on the following three claims: (1) deliberate indifference to serious medical needs against Defendants Furtik, Ventrella, Lembrick, Montague, Pereda, Brown, Stork, Bonettis, Vilayvong, Burns, Ring, Boilard, Burgress, and Boguslawa (for failure to treat Plaintiff's edema and accompanying symptoms); (2) deliberate indifference to safety/failure to protect against Defendant Santana (for Plaintiff's transfer into inmate Harvey's cell);  and (2) retaliation against Defendant Santana (for Plaintiff's transfer into Harvey's cell).

The claims are DISMISSED for:  (1) deliberate indifference/failure to protect and retaliation as to Defendant correctional officers Massey and Rule; (2) retaliation as to all Defendant nurses for failure to treat Plaintiff's edema (in response to Plaintiff's complaints); and (3) retaliation pertaining to Plaintiff's transfer from Cheshire to MacDougall-Walker.  Each of the aforementioned claims "fails to a state claim upon which relief may be granted," 28 U.S.C. § 1915A(b)(1).

All claims against Defendants in their official capacities and all claims for injunctive relief are DISMISSED pursuant to 28 U.S.C. § 1915A(b).

In accordance with the foregoing analysis, the Court enters the following orders:

(1)     **The Clerk shall** verify the current work address for Defendants Twana Furtik, Jane

20

M. Ventrella, Debbie M. Lembrick, Stacy-Ann Montaque, Eileen Pereda, Tanya Brown, Victorya Stork, Robert Bonettis, Sengcharh Vilayvong, Joy C. Burns, Nicole Ring, Cathryn Boilard, Belinda Burgress, Bonnie Boguslawa Pelczar, and Counselor Supervisor Santana  with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to each Defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver request on the thirty-fifth day after mailing.  If any Defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the Defendant in his or her individual capacity and the Defendant shall be required to pay the cost of service.

(2)      T**he Clerk shall** send Irving a copy of the Complaint [Doc. 1-1] and this Order.

(3)      **The Clerk shall** send a courtesy copy of the Complaint [Doc. 1-1] and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4)      The Defendants shall file their responses to the Complaint, either answers or motions to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If any  Defendant chooses to file an answer, that party shall admit or deny the allegations, responding to the cognizable claim(s) recited above, and may include all additional defenses permitted by the Federal Rules.

(5)      Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order.  Discovery requests need not be filed with the Court.

(6)      All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)     If  Irving changes his address at any time during the litigation of this case, pursuant to Local Civil Rule 83.1(c)2, he  MUST notify the court.  Failure to do so can result in the dismissal of the case.  Irving must give notice of a new address even if he is incarcerated.  Irving should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If Irving has more than one pending case, he should indicate all the case numbers in the notification of change of address.  Irving should also notify the Defendants or the attorney for the Defendants of his new address.

(9)     Irving shall utilize the Prisoner E-filing Program when filing documents with the Court.  Irving is advised that the Program may be used only to file documents with the Court. As the District's Local Civil Rules provide that discovery requests are not filed with the Court, discovery requests must be served on Defendants' counsel by regular mail.

(10)    The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to Irving.

It is SO ORDERED.

Dated: New Haven, Connecticut
      August 1, 2022

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

22